DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal No. 2011-35 |
| | ) | |
| DAVID MERCEDES MEJIA, JOEL DIAZ | ) | |
| HINIRIO, and JUAN ALEXIS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

ATTORNEYS:

**Ronald W. Sharpe, USA**
**Delia L. Smith, AUSA**
United States Attorney's Office
St. Thomas, U.S.V.I.
    *For the United States of America.*

**Ramon M. Gonzalez, Esq.**
Law Office of Ramon M. Gonzalez
San Juan, PR
    *For David Mercedes Mejia.*

**Pedro K. Williams, Esq.**
Law Office of Frazer and Williams
St. Thomas, U.S.V.I.
    *For Joel Diaz Hinirio.*

**David J. Cattie, Esq.**
Ogletree Deakins
St. Thomas, U.S.V.I.
    *For Juan Alexis.*

## MEMORANDUM OPINION

**GÓMEZ, J.**

Before the Court is the suppression motion of Joel Diaz Hinirio ("Hinirio").[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 26, 2011, Special Agent Jason Allen ("Agent Allen"), United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), was advised by the ICE office in St. Croix, Virgin Islands, that approximately 400 kilograms of cocaine were being stored in a residence located at #5 Lerkenlund, St. Thomas, VI (hereafter referred to as "the Lerkenlund residence").

On the same day, an ICE confidential informant (the "CI") arrived in St. Thomas from St. Croix to meet with a suspected narcotics smuggler identified as David Mercedes Mejia ("Mejia"). According to the CI, Mejia directed the CI to stay at the residence to keep guard over narcotics while Mejia was "doing business on the island."

---

[1] On February 22, 2013, the Court entered an order at ECF Docket Number 178. In that order, the Court granted in part and denied in part Hinirio's motion to suppress certain physical evidence. Also in that order, the Court denied Hinirio's motion to suppress certain statements. This memorandum opinion provides the rationale for that February 22, 2013, order.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 3

Thereafter, the agents met with the CI. The CI directed them to the Lerkenlund residence. Upon arriving at the residence, the CI produced a key to the residence. The CI then unlocked the door to the residence and led Special Agent Louis Penn inside. Upon entering the residence, the CI led the agent to the back bedroom. Once inside the bedroom, the CI directed the agent to, and the agent observed, a black automatic weapon with what appeared to be a suppressor and/or silencer attached. The agent was also shown a black handgun on the bed. The CI then led the agent to a closet in the bedroom. Inside the closet, the agent observed what appeared to be two large bundles of narcotics. The bundles were separately wrapped and gray in color.

Based on the information provided by the CI, and Agent Penn's observations, Agent Jason Allen sought a search warrant for the residence. While Agent Allen was obtaining the search warrant, other ICE agents surveyed the residence. While conducting surveillance, the agents observed Mejia and another male, later identified as Joel Diaz Hinirio ("Hinirio"), approaching the residence in a beige Toyota Corolla (the "Corolla") bearing license plate number TEE-277. The men parked the Corolla in front of the residence. Mejia and Hinirio then exited the Corolla and walked toward the residence.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 4

Upon observing the men, the agents approached the residence and identified themselves as law enforcement officials. Mejia and Hinirio then ran to the back of the residence and jumped from the rear balcony. Both men fled and disappeared into the forest.

Later that day, Magistrate Judge Ruth Miller approved a search warrant for the Lerkenlund residence. ICE agents in St. Thomas executed the search warrant the same day. Inside the residence, agents discovered approximately 531 kilograms of a substance that field tested positive for cocaine. The agents discovered 6.5 kilograms of a substance that field tested positive for marijuana. The agents also discovered a black automatic weapon with what appeared to be an attached suppressor and/or silencer and a black handgun.

Agent Allen also called the Magistrate Judge and sought to telephonically amend the previously issued search warrant to include a search of the Corolla. Inside the Corolla, agents discovered $8,000 in cash, multiple cell phones, and a global positioning system device ("GPS").

On May 4, 2012, the government brought a ten count indictment against Mejia, Hinirio, and Juan Alexis ("Alexis"). Count One charged Mejia, Hinirio, and Alexis with conspiracy to possess cocaine in violation of 21 U.S.C. §§ 841(a)(1),

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 5

841(b)(1)(A)(ii)(II), and 846 (b)(1)(D). Count Two charged
Mejia, Hinirio, and Alexis with possession with intent to
distribute cocaine in violation of 21 U.S.C. §§ 841 (a)(1),
841(b)(1)(A)(ii)(II), and 18 U.S.C. § 2. Count Three charged
Mejia, Hinirio, and Alexis with possession of a MAC 11 handgun
in furtherance of a drug trafficking crime in violation of 18
U.S.C. §§ 924(c)(1)(A) and (B)(ii). Count Four charged Mejia,
Hinirio, and Alexis with possession of a Glock handgun in
furtherance of a drug trafficking crime in violation of 18
U.S.C. § 924(c)(1)(A). Count Five charged Mejia, Hinirio, and
Alexis with possessing a MAC 11 handgun with an obliterated
serial number in violation of 18 U.S.C. §§ 922(k) and
924(a)(1)(B). Count Six charged Hinirio with being an alien in
possession of a MAC 11 handgun in violation of 18 U.S.C. §§ 922
(g)(5)(A) and 924(a)(1). Count Seven charged Hinirio with being
an alien in possession of a Glock handgun in violation of 18
U.S.C. §§ 922(g)(5)(A) and 924(a)(1). Count Eight charged Mejia,
Hinirio, and Alexis with possession of a MAC 11 handgun with
obliterated identification marks in violation of 23 V.I.C. §
481(b). Count Nine charged Mejia, Hinirio, and Alexis with
unlawful possession of a MAC 11 handgun in violation of 14
V.I.C. § 2253(a). Count Ten charged Mejia, Hinirio, and Alexis
with unlawful possession of a Glock handgun in violation of 14

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 6

V.I.C. § 2253(a). The indictment also requests forfeiture by each of the defendants.

Subsequently, Hinirio, Mejia, and Alexis filed various motions to suppress the fruit of the search of the Lerkenlund residence, the fruit of the vehicle search, and statements made to agents. The Court held a hearing on the motions to suppress on May 31, 2012 and June 7, 2012. The Court denied the motions to suppress physical evidence seized as a result of the search of the residence; granted the motions to suppress certain physical evidence seized as a result of the vehicle search; and denied Hinirio's motion to suppress his statements to police.

On March 8, 2013, Hinirio filed an additional motion to dismiss. In that motion, Hinirio sought to suppress his identification and statements made to the agents as fruit of the poisonous tree and asked for reconsideration on his motion to suppress the evidence based on newly uncovered evidence that the informant was acting as a government agent.[2] The Court held an evidentiary hearing on the motion on March 15, 2013. At the evidentiary hearing, the Court denied Hinirio's motion.

Hinirio subsequently appealed the Court's denial of his various motions to suppress. The Third Circuit remanded the case

---

[2] Mejia joined Hinirio's motion.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 7

to this Court to state the Court's essential findings for the record.

## II.  DISCUSSION

The Fourth Amendment prevents "unreasonable searches and seizures." U.S. Const. Amend. IV. A seizure is usually reasonable when it is carried out with a warrant based on probable cause. *Katz v. United States,* 389 U.S. 347, 356-357 (1967). "Warrantless searches are presumptively unreasonable." *Horton v. California,* 496 U.S. 128, 133; *see also Katz,* 389 U.S. at 357 ("Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause.'" (quoting *Agnello v. United States,* 269 U.S. 20, 33 (1925)).

"The courts, however, have fashioned exceptions to the general rule which recognize that in certain limited situations the government's interest in conducting a search without a warrant outweighs the individual's privacy interest. *United States v. Hyde,* 37 F.3d 116, 118 (3d Cir.1994) (citing *United States v. Montoya de Hernandez,* 473 U.S. at 531, 537 (1985)). Consent is one such exception. *United States v. Price,* 558 F.3d 270, 277 (2009).

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 8

### III. <u>ANALYSIS</u>

**A. The Search of the Lerkenlund Residence**

**1. Standing**

Hinirio seeks to suppress evidence seized as a result of the search of the Lerkenlund residence.

As a preliminary matter, "[s]tanding to challenge a search requires that the individual challenging the search have a reasonable expectation of privacy in the property searched," *Rakas v. Illinois*, 439 U.S. 128 (1978), and that he manifest a subjective expectation of privacy in the property searched, *see California v. Greenwood*, 486 U.S. 35, 39 (1988).

"Fourth Amendment rights are personal rights, which, like some other constitutional rights, may not be vicariously asserted." *Rakas,* 439 U.S. at 133-34, 99 S.Ct. 421 (quoting *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969)). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas,* 439 U.S. at 134; *U.S. v. Davis* 393 Fed. Appx. 895, 898 (3d Cir. 2010).

The Supreme Court addressed the interaction of the Fourth Amendment and private searches in *United States v. Jacobsen*, 466

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 9

U.S. 109 (1984). There, a Drug Enforcement Administration agent examined a package after a private search by Federal Express employees uncovered what they believed was cocaine. The *Jacobsen* Court remarked that "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* at 113.

Hinirio did not address the issue of standing in his filings or in court. As such, the Court is left searching the record for evidence of a legitimate expectation of privacy.

Agent Allen testified that after speaking with the landlords, "[t]he landlords indicated that they were wanting to secure some sort of identification to obtain the rent and that the person who identified themselves as Mr. Hinirio had explained to the landlords that he was in fact the boss of this group of what he described as construction workers from St. Croix [who occupied the premises]." (Detention Hrg., October 28, 2011, at 10:10-23.) The landlords had "a piece of paper that they had obtained with Joel Diaz-Hinirio's name and social security number and address . . . ." (*Id.* at 10:12-15.)

Agent Allen also testified that to his knowledge, Hinirio was not responsible for paying the rent. (*Id.* at 10:24-11:2.)

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 10

Moreover, when asked whether Hinirio was the one that leased or
rented the apartment, the agent simply reiterated that Hinirio's
name was on the piece of paper provided by the landlords. (*Id.*
at 11:3-6.)

It is unclear to the Court what rights or responsibilities
were conveyed to Hinirio by this paper. As such, while it is
well-settled that "[a] co-resident of a shared dwelling and an
overnight guest of a dwelling are typically held to have a
reasonable expectation of privacy in that dwelling," *United
States v. King*, 364 F. App'x 781, 786 (3d Cir. 2010), it is not
clear that Hinirio had an equivalent relationship to the
property.

The burden to establish standing to challenge the search of
the premises rests with Hinirio. *See United States v. Salvucci*,
448 U.S. 83, 95, 100 S. Ct. 2547, 2555, 65 L. Ed. 2d 619 (1980).
For the reasons stated above, Hinirio has not met that burden.

   **2. Merits**

Moreover, even if Hinirio had established standing to
challenge the search of the premises, the Court would not find
that the warrantless search of the premises violated his Fourth
Amendment Rights.

"The Fourth Amendment to the Constitution provides: 'The
right of the people to be secure in their persons, houses,

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 11

papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . .''The touchstone of the Fourth Amendment is reasonableness.'" *Price*, 558 F.3d at 277 (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)). "Therefore, the Fourth Amendment does not prohibit all searches -- only those that are unreasonable." *Id.* at 277.

The physical entry into the home is the chief evil against which the working of the Fourth Amendment is directed. *Payton v. New York*, 445 U.S. 573, 585 (1980) (citing *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). Warrantless searches and seizures of a home are presumptively unreasonable. *Payton*, 445 U.S. at 586. "Searches conducted outside the judicial process, without prior approval by a judge or magistrate, are per se unreasonable under the Fourth Amendment subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (citations omitted). It is well settled that where a search is conducted without a warrant, the prosecution bears the heavy burden of proving the facts that justify the search under one of the recognized exceptions. *United States v. Jeffers*, 342 U.S. 48, 51 (1951).

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 12

It is also "well settled that one of the specifically
established exceptions to the requirements of both a warrant and
probable cause is a search that is conducted pursuant to
consent." *Price,* 558 F.3d at 277 (citing *Schneckloth v.
Bustamonte*, 412 U.S. 218, 219(1973)). "The Supreme Court has
'long approved consensual searches because it is no doubt
reasonable for the police to conduct a search once they have
been permitted to do so.'" *Id.* at 277 (quoting *Jimeno*, 500 U.S.
at 250-51).

The Third Circuit has held that "'[t]he individual giving
consent must also possess the authority to do so,' *see
Rodriguez*, 497 U.S. at 181, and 'the consent of one who
possesses common authority over premises or effects is valid
against the absent, nonconsenting person with whom that
authority is shared.'" *United States v. Stabile*, 633 F.3d 219,
230 (3d Cir. 2011) (citing *United States v. Matlock*, 415 U.S.
164, 170 (1974)). "Common authority rests not on property rights
but 'rather on mutual use of the property by persons generally
having joint access or control . . . so that it is reasonable to
recognize that any of the cohabitants has the right to permit
the inspection in his own right and that the others have assumed
the risk that one of their number might permit the common area

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 13

to be searched." *Stabile*, 633 F.3d at 230-31 (citing *Matlock*, 415 U.S. at 172 n.7).

"However, a third party lacks authority to consent to a search of an area in which the target of the search has not 'relinquished his privacy.'" *Stabile*, 633 F.3d at 231-32 (citing *United States v. King*, 604 F.3d 125, 137 (3d Cir. 2010)); *United States v. Block*, 590 F.2d 535 (4th Cir. 1978) (holding that a mother had authority to consent to a search of her son's bedroom, but not to his locked footlocker kept under his bed); *Randolph*, 547 U.S. at 135 (Roberts, C.J., dissenting) ("To the extent a person wants to ensure that his possessions will be subject to a consent search only due to his own consent, he is free to place these items in an area over which others do not share access and control, be it in a private room *or* a locked suitcase under a bed.") (emphasis added). "Thus if a person has not 'relinquished his privacy' . . . a third party would have no authority to consent to the search or seizure of those segregated materials." *Stabile*, 633 F.3d at 232.

The Court will begin its inquiry by determining whether the confidential informant has common authority over the premises searched. In many cases involving common authority, the consenting individual is related to the owner of the property or is a co-inhabitant of the property. However, "employees with

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 14

significant responsibilities relating to the object of the
search" may also consent to a search. *Bolden v. Se. Pennsylvania
Transp. Auth.*, 953 F.2d 807, 826 (3d Cir. 1991); *see, e.g.,
United States v. Buettner-Janusch*, 646 F.2d 759 (2d Cir.
1981)(holding that an undergraduate research assistant had
common authority and could consent to a search of his employer's
laboratory); *United States v. Murphy*, 506 F.2d 529 (9th Cir.
1974)(holding that an employee could consent to the search of a
warehouse even though the employee was given the key to the
warehouse only when he was to perform work on the premises).

As the Sixth Circuit has noted,

> [t]he question of when an employee's consent is
> sufficient for entry into a residence has not been
> treated uniformly by the courts. 3 Wayne R. LaFave,
> Search and Seizure: A Treatise on the Fourth
> Amendment, § 8.6(c) (3d ed.2002). Some have relied
> on a theory of agency, while others depend entirely
> on whether the employee had apparent authority. *Id.*
> In general, the cases have engaged in a fact-
> specific analysis of the level of responsibility
> given to the employee. If the employee's job duties
> include the granting of access to the premises,
> authority to consent is more likely to be found. A
> caretaker left in charge of a home for several weeks,
> for example, might have authority to permit entry,
> while a worker who is present on a more limited basis
> would not. *Id.*

*United States v. Jones*, 335 F.3d 527, 531 (6th Cir. 2003)

Here, Mejia picked up the confidential informant from the
seaplane terminal and drove him to the premises; provided the
confidential informant with firearms; and told the confidential

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 15

informant to guard the narcotics and not leave the house. (Supp. Hrg. May 31, 2011, at 21:4-20.). Mejia then left the premises. (*Id.* at 26:4-9.) He returned with Hinirio that night, retrieved drugs and a firearm, and then left again. (*Id.* at 27:8-14.)

The informant then spent the night on the premises. There is no indication in the record that Mejia or Hinirio returned to the premises again until after the agents arrived the following day.

The circumstances presented here bear some similarity to the circumstances presented in *United States v. Jenkins*, 46 F.3d 447 (5th Cir. 1995). In that case, the defendants were charged with racketeering and interstate shipment of obscene materials via common carrier. *Id.* at 448. The defendants were connected with one of two companies. *Id.* at 449. One of the companies managed adult bookstores, the other—White Fabricating—maintained video display systems in those adult bookstores. *Id.* White Fabricating employed one individual, Mark Boyd ("Boyd"), to retrieve shipments of videotapes and install them in them in the adult bookstores. *Id.* at 450. While investigating the case, the FBI enlisted Boyd's aid as a cooperating witness. *Id.* Subsequently, Boyd delivered five shipments of videotapes to the FBI. *Id.* Without a warrant, the FBI inspected and copied the videotapes before returning them to Boyd. *Id.* The district court

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 16

suppressed the evidence obtained from these searches. *Id.* at

448. On appeal, the Fifth Circuit held that Boyd had actual

authority over the videotapes and reversed the district court.

The Fifth Circuit first noted several indicia of Boyd's

authority. Specifically, Boyd was White Fabricating's only

employee in Memphis; he was authorized to open the packages and

remove the videotapes; "he had sufficient dominion and control

over the packages that he could pick them up and carry them

away"; and he was authorized to view the video tapes and ensure

the display systems functioned properly. *Id.* at 455-56. The

Firth Circuit reasoned that:

> [h]aving vested possession and almost absolute
> control in Boyd, the law is well settled that
> Appellees assumed the risk that Boyd would engage in
> unauthorized conduct with the videos.
>
> . . .
>
> Indeed, turning back to the Appellee's reasonable
> expectation of privacy, it was patently unreasonable
> for Appellees to have any expectation of privacy
> vis-a-vis Boyd. He had unlimited access to the
> videotapes, absolute dominion and control over the
> videotapes and no direct supervision, or indeed any
> fellow employees in the geographic vicinity.

*Id.* at 456-57; *see also United States v. Murphy*, 506 F.2d 529,

530 (9th Cir. 1974) ("We conclude that Tucker's custody of the

key gave him sufficient dominion over the premises to enable him

to grant the necessary consent. Since Murphy himself put the

premises under the immediate and complete control of Tucker, who

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 17

voluntarily consented to the search, we hold that the search was not unreasonable.").

    Similarly, here, the informant was left alone at the premises. Significantly, his responsibility was to guard the premises. As such, he controlled access to the premises in the same manner that Boyd controlled access to the videotapes. As such, when Mejia hired the informant to guard the premises, the conspirators assumed the risk that the informant would permit access to other individuals, including the FBI. Under these circumstances, the Court finds that the informant "exercised significant responsibilities relating to the object of the search," *Bolden*, 953 F.2d at 826, such that he could consent to the search.[3]

    The Court also notes that no evidence was produced showing that any member of the drug smuggling operation had a higher expectation of privacy in any part of the premises--such as the back bedroom or the attached closet. There is no indication in the record that anyone had in any way sought to exclude the informant from those areas. Therefore, the Court finds that the

---

[3] Mejia hired the informant. Mejia's relationship to the premises is not entirely clear. Regardless, even if Mejia could not give the informant actual authority to consent to a search, there was clearly apparent authority to consent.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 18

informant had common authority over the entire premises--
including the closet and the back bedroom.

As an individual exercising common authority over the
premises, the confidential informant's status as a government
agent is irrelevant to whether any search of the premises was
permissible. *See United States v. Shelton*, 337 F.3d 529, 538
(5th Cir. 2003); *Jenkins*, 46 F.3d at 460. In *United States v.
Shelton*, the Fifth Circuit held that that an informant who the
court found was a government agent could consent to searches of
premises over which she exercised common authority. *Id.* The
court reasoned that

> neither [the informant's] principal purpose of
> procuring evidence for the government instead of
> picking up personal belongings, nor the absence of
> her intention of returning to the marriage-even if
> true-precludes our concluding that she maintained
> common authority, because it is not *her* subjective
> intention that controls our decision. As discussed
> above, the validity of third-party consent depends
> in principal part on the extent to which the
> defendant forgoes his reasonable expectation of
> privacy toward that third party. Thus, although the
> intentions of the third party may carry some weight,
> it is the defendant's treatment of his own privacy
> interests that predominates in the determination of
> the third party's right to consent.

*Id.* The Court agrees with the Fifth Circuit's reasoning. There
is no compelling rationale for preventing a government agent
from voluntarily consenting to a search when the informant has
the requisite authority over the premises to be searched.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 19

Having concluded that the question of agency does not prevent the informant from consenting to the search of the premises, the Court must now determine whether the informant voluntarily authorized a search of the home pursuant to his common authority over the premises.

> "[The Court] determine[s] the voluntariness of a consent by examining the totality of the circumstances." *Price,* 558 F.3d at 278; *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041. [The Court]consider such factors as "age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter, the repetition or duration of the questioning; and the use of physical punishment." *Price,* 558 F.3d at 278; *see Schneckloth,* 412 U.S. at 226, 93 S.Ct. 2041. The "'setting in which the consent was obtained [and] the parties' verbal and non-verbal actions' " are also relevant. *Price,* 558 F.3d at 278 (quoting *United States v. Givan,* 320 F.3d 452, 459 (3d Cir.2003)).

*United States v. Stabile*, 633 F.3d 219, 231 (3d Cir. 2011).

Here, the testimony is that the informant told law enforcement that there were drugs and firearms within the premises, and indicated to the agents that he could show them the drugs and firearms. Agent Penn then followed the informant inside where the informant showed him the drugs and firearms. (*See* Supp. Hrg., May 31, 2012, at 93:21-95:15.) The record reveals a willingness to permit a search of the premises. There is no indication of any coercion or involuntariness. Therefore, the Court holds that the informant's consent was voluntary.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 20

Because the Court has found that the informant had the requisite authority to consent to the warrantless search and did in fact consent to the search, the warrantless search of the premises did not violate the Fourth Amendment.

## B. Vehicle Search

### 1. Standing

Regarding the vehicle search, the evidence presented shows that the Corolla was registered to Hinirio. (Supp. Hrg., May 31, 2012, at 32:21-25.) As such, he has standing to challenge the vehicle search.

### 2. Merits

Hinirio seeks to suppress evidence seized pursuant to the search of the Corolla because there was no valid warrant to search the vehicle.

The government avers that the search warrant for the premises was amended telephonically to include a search of the Corolla. The government avers that any deficiency in the telephonic warrant falls under the good faith exception to the exclusionary rule.

"The defendant challenging a search must show the warrant to be invalid by a preponderance of the evidence." *United States v. Richards*, 943 F.2d 1991, 548 (5th Cir. 1991) (internal citations omitted). "Initially, the defendant must make a prima

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 21

facie showing of illegality." *Id*. (internal citation omitted).

"The government must then present rebuttal evidence. However,

the burden of persuasion remains at all times with the

defendant." *Id*. at 549 (internal citation omitted).

"[I]f a magistrate is not nearby, a telephonic search

warrant can usually be obtained." *Steagald v. United States*, 451

U.S. 204, 222 (1981) (citing Fed. R. Crim. P. 41(c)(1), (2)).

Federal Rule of Criminal Procedure 41 ("Rule 41") governs the

issuance of search warrants. At the relevant times in this case,

Rule 41 provided that "[a] magistrate judge may issue a warrant

based on information communicated by telephone or other reliable

electronic means." Fed. R. Civ. P. 41(d)(3)(a) (2010).[4]

> [Rule 41]'s requirements are clear: The person
> requesting a warrant must prepare a duplicate original
> warrant and read it verbatim to the federal magistrate;
> the federal magistrate must enter what is read,
> verbatim, on the original warrant and "immediately" sign
> it; the caller must be under oath from the inception; a
> recorded or stenographic record of the call must be made
> and filed in the court record.

*United States v. Rome*, 809 F.2d 665, 667 (10th Cir. 1987)

(discussing Rule 41 prior to its amendment in 2011).

_____

[4] Effective December 1, 2011, "[t]he procedures that . . . govern[] search
warrants 'by telephonic or other means,' formerly in Rule 41(d)(3) and
(e)(3), . . . [were] relocated to [Federal Rule of Civil Procedure 4.1]." *See*
Fed. R. Crim. P. Rule 4.1, advisory committee's note, 2011 adoption. The only
substantive change to those procedures was permitting a magistrate judge to
"simply prepare a written *summary* or order memorializing the affirmation of
the oath" as opposed to "a verbatim record of the entire conversation with
the applicant." *See id.*

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 22

Here, there were a number of failures to comply with Rule 41. Failure to comply with all the requirements of Rule 41 does not, however, necessarily compel the suppression of evidence uncovered through the procedurally deficient telephonic warrant. *Cf. Rome*, 809 F.2d at 667-668.

Regardless, the cumulative effect of the failures in this case present the Court with circumstances that are analogous to the circumstances presented in *Bartholomew v. Commonwealth of Pennsylvania*, 221 F.3d 425 (3d Cir. 2000). In that case, an agent in Pennsylvania's Financial Investigation Unit requested a warrant to search the plaintiffs' home and business. The agent also participated in the execution of the warrant to search the business. *Id.* at 426-27. "[T]he affidavit [offered in support of the search warrant] and the list of items to be seized were sealed . . . ." *Id.* at 427.

The plaintiffs filed 24 U.S.C. §§ 1983 and 1985 claims alleging violations of the Fourth Amendment against a number of defendants including the agent. *Id.* The agent asserted a qualified immunity defense. *Id.* The district court denied the agent summary judgment on his qualified immunity defense. *Id.* It reasoned that denial was appropriate

> because the list of items to be seized was sealed and, thus, the warrants failed to identify those items, the warrants lacked the particularity required by the Fourth Amendment . . . [The agent],

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 23

> the Court found, had violated a 'clearly established
> constitutional right,' namely the right of the . .
> . [plaintiffs] to be free from an unlawful search
> and seizure.

*Id.*

On appeal, the Third Circuit held that "generally speaking, where the list of items to be seized does not appear on the face of the warrant, sealing that list, even though it is 'incorporated' in the warrant, would violate the Fourth Amendment."[5] *Id.* at 429-30. The Third Circuit reasoned, in relevant part:

> Clearly, a problem at least potentially arises when
> much of the requisite information for a warrant is
> found in a document other than the warrant itself
> because, on the face of the warrant, the necessary
> particularity will be lacking. We have concluded,
> however, along with most courts, that "[w]hen a
> warrant is accompanied by an affidavit that is
> incorporated by reference, the affidavit may be used
> in construing the scope of the warrant." *Johnson,*
> 690 F.2d at 64-65. The requirement that affidavits
> accompany warrants which themselves lack
> particularity serves two purposes: one, to limit the
> agents' discretion as to what they are entitled to
> seize; and two, to inform the subject of the search
> what can be seized. *See United States v. McGrew,* 122
> F.3d 847, 849 (9th Cir. 1997).
>
> Here, the warrant did in fact reference the list of
> items to be seized as Exhibit A and, thus,
> "incorporated" the list of items. That exhibit,
> however, was sealed. Before us, then, is the
> unusual, and largely heretofore undiscussed,

---

[5] The Third Circuit left "open the possibility that there can be that rare case in which sealing may be thought necessary." *Bartholomew v. Com. of Pa.,* 221 F.3d 425, 430 (3d Cir. 2000)

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 24

> question of whether an incorporated but sealed list
> of items can be used in construing the scope of the
> warrant in order to determine whether the warrant
> will pass constitutional muster. What little case
> law there is suggests it would not. As the *McGrew*
> Court observed, "[i]f the government wishes to keep
> an affidavit under seal"—in order to protect
> witnesses, for example—"it must list the items it
> seeks with particularity in the warrant itself. It
> is the government's duty to serve the search warrant
> on the suspect, and the warrant must contain, either
> on its face or by attachment, a sufficiently
> particular description of what is to be seized." *Id.*
> at 850.
>
> The District Court, as we have noted, concluded that
> because the list was sealed, the warrants themselves
> were devoid of the requisite specificity and, thus,
> that the Fourth Amendment was violated . . . [W]e
> agree with the District Court that the warrants were
> not sufficiently particular to satisfy the Fourth
> Amendment . . . ."

*Id.* at 428-29 (footnote omitted)[6]

Here, the warrant itself does not mention the Corolla. The

evidence reflects, however, that there was an annotation made by

the Magistrate indicating "that there was an amended affidavit

based upon verbal contact . . . ." (Supp. Hrg., May 31, 2012, at

34:24-35:4.) At the time of the search, no amended affidavit had

been drafted. (*Id.* at 37:23-38:4.) Even assuming *arguendo* that

such notation uses sufficient words of incorporation, at most,

the Court could consider that annotation an attempt to

---

[6] Ultimately, the Third Circuit reversed the district court because when the
agent acted, the right the court discussed was not clearly established. *Id.*
at 429.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 25

incorporate the verbal contact with the Magistrate or an as-of-yet undrafted affidavit into the warrant. Verbal statements and a non-existent updated affidavit, like a sealed list of items to be searched, do not appear on the face of the document.[7] As such, the Court finds that the warrant does not include any provision permitting the search of the Corolla.

The Court must now determine whether the good faith exception applies. The good faith exception does not apply:

> 1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> 2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;
>
> 3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or
>
> 4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010).

Most relevant to the Court's inquiry is the fourth exception. The Third Circuit has previously held that when determining whether particularity is evident on the face of the

---

[7] The Court also notes that the agent who made verbal contact with the Magistrate did not personally search the Corolla. (Supp. Hrg., May 31, 2012, at 41:4-8.)

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 26

warrant, the Court must consider any content that a reasonable
police officer would believe was included in the warrant.

In *United States v. Tracey*, 597 F.3d 140, 152 (3d Cir.
2010), a police officer requested a warrant. He checked a box
indicating that the probable cause affidavit was attached and
handwrote the total number of pages of the affidavit, which was
attached to the warrant. The Third Circuit held that the
affidavit--including the description of the items to be searched
and seized--was not incorporated into the warrant because the
warrant did not contain adequate words of incorporation. *Id.* at
144-45. Nevertheless, the Court held that the good faith
exception applied because the police officer "could have
reasonably relied on the warrant because a reasonable officer in
his position would assume that the warrant incorporated and
would be construed with the attached affidavit." *Id.* at 152.

An applicant for a telephonic warrant first "must prepare a
'proposed duplicate original warrant.'" Fed. R. Civ. P.
41(e)(3)(A) (2010). After preparing the warrant, the applicant
then "read[s] . . . the contents of the document verbatim to the
magistrate judge" who enters the information into an original
warrant. Fed. R. Civ. P. 41(e)(3)(A)-(B) (2010). If the warrant
is issued, the magistrate judge "sign[s] the original warrant .
. . and transmit[s] it by reliable electronic means to the

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 27

applicant or direct the applicant to sign the judge's name on the duplicate original warrant." Fed. R. Civ. P. 41(e)(3)(D) (2010).

Here, in contrast to the situation presented in *United States v. Tracey*, any attempt at incorporation at best incorporated oral statements or an as-of-yet unwritten affidavit. It is difficult for the Court to appreciate from the objective facts adduced at the hearing on the record how an agent on the scene could have been aware of an unincorporated and unwritten affidavit. As such, the Court holds that the warrant was so facially deficient that it failed to particularize the place to be searched--with respect to the Corolla--because no mention of the Corolla appeared in the warrant or any incorporable document at the time of the search. Therefore, the good faith exception does not apply.

The record also does not support the application of another exception that would permit the introduction of physical evidence resulting from the search of the Corolla.

Accordingly, for the reasons stated above, the Court will suppress any physical evidence resulting from the search of the Corolla.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 28

## C. Hinirio's Identification

Hinirio also argues that his identification should be suppressed. He seeks to suppress his identification on two bases: (1) that his identification was the fruit of the illegal vehicle search; and (2) that the identification procedures violated due process.

### 1. Fruit of the Poisonous Tree

Hinirio argues that his identification should be suppressed as fruit of the poisonous tree because: (1) his registration was uncovered as a result of the illegal vehicle search; (2) his picture was discovered after running his registration through the Bureau of Motor Vehicle database; (3) the picture was shown to the confidential informant who identified Hinirio; and (4) based upon that identification, an arrest warrant was obtained for Hinirio.

Identity and government files associated with that identity generally cannot be suppressed as fruit of the poisonous tree. *See United States v. Bowley*, 435 F.3d 426, 431 (3d Cir. 2006), *as amended* (Feb. 17, 2006); *see also I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984)("The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 29

interrogation occurred."). In *United States v. Bowley*, the

defendant "admitted that he was in the United States illegally,

and he gave the officers a Jamaican passport containing his

photograph and the name 'Junior Anthony Miller.'" *Bowley*, 435

F.3d, at 427-28. The defendant was then "handcuffed, taken to

the police station, and held over night." *Id.* at 428. The next

day, the defendant's

> Fingerprints . . . were electronically scanned. The
> computer database matched the scan to the
> fingerprint records of "Gary Bowley." Immigration
> records showed that Bowley was a citizen of Jamaica
> who had previously been deported from the United
> States on November 17, 2000, following convictions
> for selling marijuana, attempted robbery, possession
> of a weapon and 'bail jumping.' After matching the
> fingerprints, an ICE agent advised Bowley of his
> *Miranda* rights and Bowley told the agent that he did
> not want to make a statement. Nevertheless, an ICE
> agent subsequently questioned Bowley about
> biographical data such as his parents' names, his
> occupation, and whether he had any children.

*Id.* at 429.

After the defendant was charged with illegally reentering

the United states after having been previously deported, he

filed a motion "to suppress all evidence obtained from him,

including his statement that he was illegally in the United

States, his passport, his fingerprints, and the statements that

he made after refusing to waive his *Miranda* rights." *Id.* at 428.

The district court found that the defendants had been illegally

arrested when he was handcuffed and taken to the police station.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 30

*Id.* at 428-29. The district court suppressed the evidence

obtained after the defendant's arrest, including "all of the

evidence police had gathered about Bowley's identification from

the fingerprint scan, his biographical information, and his

Jamaican passport."[8] *Id.* at 429. The court reasoned that "the

discovery of Bowley's identity was the fruit of his illegal

arrest." *Id.*

On appeal, the Third Circuit reversed the district court.

*Id.* at 431. The Third Circuit reasoned that:

> Although we have not previously addressed this
> precise question, a number of other courts of
> appeals have addressed it, and each has refused to
> suppress a defendant's immigration file or identity
> in the context of a criminal prosecution for illegal
> reentry in violation of § 1326. Furthermore, an
> alien charged with illegal reentry has no possessory
> or proprietary interest in his/her immigration file
> or the documentary evidence contained in that file.
> Similarly, an alien has no reasonable expectation of
> privacy in a file that is maintained solely by a
> government agency for official purposes and kept in
> the custody of that agency. Accordingly, absent the
> kind of egregious circumstances referred to in
> *Lopez-Mendoza,* we hold that the Fourth Amendment
> does not provide a basis for an alien to suppress
> his/her immigration file, or information in that
> file.

*Id.* (citations omitted).

---

[8] The district court denied the defendant's motion to suppress insofar as the
defendant sought to suppress the passport or the defendant's admissions made
prior to his arrest. *Id.* at 428.

The discovery of Hinirio's name during an illegal search is not materially different from the discovery of Bowley's name during an illegal arrest and identification procedures. Moreover, a defendant no more has a privacy interest in his Bureau of Motor Vehicles file than in his immigration records. Given the totality of the circumstances here, the Court finds that the identification of Hinirio is not suppressible as fruit of the poisonous tree as there is no egregious violation of constitutional rights justifying suppression.

Neither the Third Circuit in *United States v. Bowley* nor the Supreme Court in *I.N.S. v. Lopez-Mendoza* has defined such an egregious violation. However, in creating the "egregious violation" exception, the Supreme Court cited to its decision in *Rochin v. California*, 342 U.S. 165 (1952). In that case

> [h]aving 'some information that (the petitioner here) was selling narcotics,' three deputy sheriffs of the County of Los Angeles, on the morning of July 1, 1949, made for the two-story dwelling house in which [the petitioner] lived with his mother, common-law wife, brothers and sisters. Finding the outside door open, they entered and then forced open the door to [petitioner's] room on the second floor. Inside they found petitioner sitting partly dressed on the side of the bed, upon which his wife was lying. On a 'night stand' beside the bed the deputies spied two capsules. When asked 'Whose stuff is this?' [the petitioner] seized the capsules and put them in his mouth. A struggle ensued, in the course of which the three officers 'jumped upon him' and attempted to extract the capsules. The force they applied proved unavailing against [the petitioner's] resistance. He was handcuffed and taken to a

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 32

> hospital. At the direction of one of the officers a
> doctor forced an emetic solution through a tube into
> [the petitioner's] stomach against his will. This
> 'stomach pumping' produced vomiting. In the vomited
> matter were found two capsules which proved to
> contain morphine.

*Id.* at 166. At trial, the "chief evidence against [the petitioner] was the two capsules." *Id.* He was convicted "on the charge of possessing 'a preparation of morphine.'" *Id.*

On appeal, the Supreme Court reversed the judgment because "the conviction of the petitioner had been obtained by methods that offend the Due Process Clause." *Id.* at 174. The Court reasoned, in part, that

> this is conduct that shocks the conscience.
> Illegally breaking into the privacy of the
> petitioner, the struggle to open his mouth and
> remove what was there, the forcible extraction of
> his stomach's contents—this course of proceeding by
> agents of government to obtain evidence is bound to
> offend even hardened sensibilities. They are methods
> too close to the rack and the screw to permit of
> constitutional differentiation.

*Id.* at 172.

The precise contours of the egregious violation exception are yet to be defined. Nevertheless, having examined the factual circumstances presented in *Rochin v. California*, the Court is satisfied that no such egregious violation has occurred in this matter. As such, even if Hinirio's identification was the result of an illegal search, his identity and the associated government files are not suppressible as fruit of the poisonous tree.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 33

Accordingly, Hinirio's identity will not be suppressed as fruit of the poisonous tree.

## 2. **Due Process**

Hinirio also argues that his identification should be suppressed because the agent's identification procedures were not consistent with due process.

> An identification procedure that is both (1) unnecessarily suggestive and (2) creates a substantial risk of misidentification violates due process. *Manson v. Brathwaite,* 432 U.S. 98, 107, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). Unnecessary suggestiveness "contains two component parts: that concerning the suggestiveness of the identification, and that concerning whether there was some good reason for the failure to resort to less suggestive procedures." *United States v. Stevens,* 935 F.2d 1380, 1389 (3d Cir. 1991) (internal quotations and emphases omitted).

*United States v. Brownlee*, 454 F.3d 131, 137-38 (3d Cir. 2006). It is the defendant's burden to show that the identification was unnecessarily suggestive. *See United States v. Mathis*, 264 F.3d 321, 331 (3d Cir. 2001). Once that burden is met, the court "consider[s] the admissibility of the identification under the totality of the circumstances." *Reese v. Fulcomer*, 946 F.2d 247, 259 (3d Cir. 1991) (internal quotations omitted). That determination requires the Court to "balance[e] the suggestiveness of the procedures against" certain factors indicating the reliability of the identification. *See id.* The factors to be considered "include the opportunity of the witness

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 34

to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

Here, Agent Allen testified that he printed a photograph of Hinirio from the Bureau of Motor Vehicle's database. (Supp. Hrg., March 15, 2013, at 40:22-41:15.) Agent Allen then showed that photograph to the confidential informant. (*Id.* at 41:25-42:1.) Agent Allen further testified that when he showed the photograph to the confidential informant, the confidential informant "said that's him. That's the Big Dominican." (*Id.* at 42:8-10.) The Third Circuit has previously held that showing a witness a picture of only one individual is a suggestive identification procedure. *See Gov't of Virgin Islands v. Petersen*, 553 F.2d 324, 326-27 (3d Cir. 1977)(noting that "[t]he government concedes, as it must, that it was suggestive to have shown the witness only photographs of defendant"). As such, the one photograph identification procedure used here was clearly suggestive.

Nevertheless, a suggestive identification is only unduly suggestive if there is no good reason for the failure to use less suggestive identification procedures. In *Simmons v. United*

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 35

*States*, 390 U.S. 377, 384 (1968), the United States Supreme

Court considered whether suggestive identification procedures

were justified under circumstances analogous to the

circumstances presented in this case.

In *Simmons v. United States*,

> two men entered a Chicago savings and loan
> association. One of them pointed a gun at a teller
> and ordered her to put money into a sack which the
> gunman supplied. The men remained in the bank about
> five minutes. After they left, a bank employee
> rushed to the street and saw one of the men sitting
> on the passenger side of a departing white 1960
> Thunderbird automobile with a large scrape on the
> right door. Within an hour police located in the
> vicinity a car matching this description. They
> discovered that it belonged to a Mrs. Rey, sister-
> in-law of petitioner Simmons. She told the police
> that she had loaned the car for the afternoon to her
> brother, William Andrews.
>
> At about 5:15 p.m. the same day, two FBI agents came
> to the house of Mrs. Mahon, Andrews'[s] mother,
> about half a block from the place where the car was
> then parked. The agents had no warrant, and at trial
> it was disputed whether Mrs. Mahon gave them
> permission to search the house. They did search, and
> in the basement they found two suitcases, of which
> Mrs. Mahon disclaimed any knowledge. One suitcase
> contained, among other items, a gun holster, a sack
> similar to the one used in the robbery, and several
> coin cards and bill wrappers from the bank which had
> been robbed.
>
> The following morning the FBI obtained from another
> of Andrews'[s] sisters some snapshots of Andrews and
> of petitioner Simmons, who was said by the sister to
> have been with Andrews the previous afternoon.
>
>    . . .

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 36

> There seem to have been at least six of these pictures, consisting mostly of group photographs of Andrews, Simmons, and others. Later the same day, these were shown to the five bank employees who had witnessed the robbery at their place of work, the photographs being exhibited to each employee separately. Each of the five employees identified Simmons from the photographs. At later dates, some of these witnesses were again interviewed by the FBI and shown indeterminate numbers of pictures. Again, all identified Simmons.

*Id.* at 380-82 (footnote omitted). At trial, the petitioner was

convicted of the crimes charged. *Id.* at 381.

On appeal, the Supreme Court held that the identification

of Simmons did not violate due process. *Id.* at 385. The Court

reasoned, in relevant part, that

> it is not suggested that it was unnecessary for the FBI to resort to photographic identification in this instance. A serious felony had been committed. The perpetrators were still at large. The inconclusive clues which law enforcement officials possessed led to Andrews and Simmons. It was essential for the FBI agents swiftly to determine whether they were on the right track, so that they could properly deploy their forces in Chicago and, if necessary, alert officials in other cities. The justification for this method of procedure was hardly less compelling than that which we found to justify the 'one-man lineup' in Stovall v. Denno, supra.

*Simmons v. United States*, 390 U.S. 377, 384-85 (1968).

Similarly, here, a serious felony had been committed and an

unidentified suspect had fled. The agents had records from the

Bureau of Motor Vehicles that suggested the fleeing individual

was Hinirio. Certainly then, it was permissible for them to

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 37

engage in this identification procedure to ensure that they were on the right track. As such, the Court does not find that the identification procedure used here was unduly suggestive.

Moreover, even if the identification was unduly suggestive, the Court is satisfied that there was no substantial risk of misidentification. If identification procedures are unduly suggestive, the Court "balance[s] the suggestiveness of the procedures against" certain factors indicating the reliability of the identification. *See id.* The factors to be considered "include the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson*, 432 U.S. at 114.

The Third Circuit has previously considered whether similarly suggestive identifications were nevertheless reliable. *See, e.g., Petersen*, 553 F.2d 324, at 327. In *Government of the Virgin Islands v. Peterson*, the witness

> stood within a few feet of the young man in the bar for about 30 minutes. During this time her attention was drawn to him by his engagement in a heated argument with two patrons and his physical ejectment by Carrasco. The photographic identification was made within 48 hours and her identification both in and out of court was positive. The previous day she had reviewed numerous photos but failed to identify

> any suspects. The description made to police
> immediately after the shooting paralleled that of
> defendant with one exception. She described the
> young man as about 5'6 in height, while defendant
> testified, without contradiction, that he is 6'0
> tall.

*Petersen*, 553 F.2d 324, at 327. The Third Circuit held "in the

totality of circumstances, there was not a substantial

likelihood of misidentification." *Id.*

In contrast, the Third Circuit held that a one photo

identification procedure violated due process in *United States*

*v. Smith*. In that case, the witness,

> [Aaron] Rissinger, [was] a drug user and occasional
> distributor of powder cocaine, testified that he
> bought his cocaine from Malik. When he was arrested
> by Pennsylvania State Police officers, he agreed to
> cooperate. He was questioned by agents of the Drug
> Enforcement Agency ("DEA") about his activities and
> about others who were involved. The DEA agents
> showed him one photograph, a 6" x 10" black and
> white full body photo of Smith. They asked him if the man
> in the photograph was Jamal and he agreed. Jamal is
> Smith's middle name.
>
> Rissinger did not testify that he bought drugs
> directly from Smith. Instead, he testified that
> Smith drove Malik to the drug buys that Rissinger
> made from Malik. At trial, Rissinger was asked to
> identify Smith and testified that he was the person.
>
> . . .
>
> Rissinger apparently observed Smith on two occasions
> when Smith was allegedly the driver of the
> automobile that drove Malik to meet Rissinger to
> sell him cocaine. Each of these instances was only
> 45 seconds and his view was hampered by two car
> windshields. Rissinger's focus was undoubtedly on
> Malik and not Smith. Moreover, Rissinger could not

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 39

>        describe any of Smith's specific characteristics
>        except to say he "looks about the same as he did two
>        years ago."

*Id.* at 611-12 (footnote omitted).

Here, there were a number of indicia of reliability. The testimony shows that after the confidential informant was transported to the stash house by Mejia, Mejia returned the night of June 26, 2011 with the individual that the informant referred to as the big Dominican. (Supp. Hrg., May 31, 2012, at 26:4-27:18.) The informant also saw Hinirio the night of June 27, 2011, when Hinirio got out of the car to bring groceries to the informant. (*Id.* at 33:13-34:9.) In addition, the informant referred to Hinirio as the big Dominican when he initially met with the agents, before the identification. (Supp. Hrg., March 15, 2013, at 58:1-59:17.)  Shortly thereafter, on June 28, 2011, the informant was shown the picture of Hinirio taken from the Bureau of Motor Vehicles Database. (*Id.* at 41:25-42:10.) The informant volunteered "that's him. That's the big Dominican" when shown the picture. (*Id.*)

The circumstances presented here are much more similar to the circumstances presented in *Government of the Virgin Islands v. Peterson* than the circumstances presented in *United States v. Smith*. Here, as in *Government of the Virgin Islands v. Smith*, the informant had an adequate opportunity to observe the

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 40

suspect. Moreover, the identification was made shortly after the witness's interaction with the suspect. Also, the identification was definite. In light of the informant's opportunity to view Hinirio, the level of certainty demonstrated by his identification, and the short time between the informant's interaction with Hinirio and the informant's identification, the Court is satisfied that any undue suggestiveness is outweighed by the reliability of the identification.

Therefore, the Court will not suppress Hinirio's identification as violative of due process.

## D. Hinirio's Statements

Hinirio seeks to suppress any written or oral statements and/or confessions allegedly made by him during his interrogation on October 25, 2011. He seeks to suppress these statements on five separate grounds: (1) the arrest and subsequent statements were the fruit of an impermissible vehicle search; (2) the arrest and subsequent statements were the fruit of an unduly suggestive and unreliable identification procedure that violated due process; (3) his waiver of his *Miranda* rights was not knowing, voluntary, and intelligent; (4) he invoked his right to counsel under *Miranda*; and (5) his statements were an involuntary confession. Hinirio's first two arguments fail because: (1) as discussed above, his identity was not

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 41

suppressible and, thus, in light of the ample evidence of criminal activity, his arrest and his statements were not the fruit of the illegal vehicle search; and (2) as discussed above, the identification procedure did not violate due process.

## 1. Miranda Waiver

The Fifth Amendment to the Constitution states in pertinent part that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law . . . ." Evidence obtained as a result of custodial interrogation is inadmissible unless the defendant is first warned of his rights and knowingly waives those rights. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).

An individual "may waive his *Miranda* rights if the waiver is made knowingly, intelligently, and voluntarily." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005). To make a determination that a waiver is voluntary, two factors must be shown: (1) the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception; and (2) the waiver must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v.*

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 42

*Burbine*, 475 U.S. 412, 421 (1986). It is the government's burden to prove a valid waiver of Miranda rights and the voluntariness of the statement by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

To determine the sufficiency of *Miranda* warnings and any waiver of rights, the Court examines the totality of the circumstances surrounding the questioning. *United States v. Velasquez*, 885 F.2d 1076, 1086 (3d Cir. 1989). "In analyzing the totality of the circumstances, a court must look at the facts of the particular case, including the background, experiences, and conduct of the suspect." *Id.* Potential circumstances affecting the voluntariness of statements made include: (1) evidence of police coercion; (2) the length and location of the interrogation; (3) the defendant's maturity, physical condition, mental health and level of education; (4) whether *Miranda* warnings were given; and (5) whether an attorney was present for the interview. *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (citing *Withrow v. Williams*, 507 U.S. 680, 693 (1993)). Courts will not hold that a confession was involuntary unless it was the product of "police overreaching." *Connelly*, 479 U.S. at 170.

Hinirio asserts that his waiver of his rights was not voluntary. At the suppression hearing, Hinirio testified that

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 43

when he was arrested, the agents were dressed in black clothing that did not identify them as law enforcement, (Supp. Hrg., June 7, 2012, Afternoon, at 31:17-22), and the agents also did not identify themselves as law enforcement, (*Id.* at 32:19-21.) He also testified that when he was arrested, his head was covered with something "[m]ore or less like a hood," (*Id.* at 30:22-31:3), when he was outside the agent's Jeep and about to enter, (*Id. at* 31:31-32-5.)

Hinirio further testified that he was told that if he "ask[ed] for an attorney, [he] was going to have problems with [his] wife's immigration." (*Id.* at 35:5- 19.) Specifically, he testified that he was informed that his wife would be deported. (*Id.* at 35:21-36:1.) He further testified that he was told that "if [he] didn't cooperate, [he] was going to be given 30 years and that [he] was in serious problems." (*Id.* at 36:1-3.)[9]

At the suppression hearing, the Government produced a signed *Miranda* waiver form written in Spanish.[10] (Supp. Hrg., May 31, 2012, at 158:23-159:12.) Agent Garcia testified that he was

---

[9] It is unclear from the record whether the statements alleged in this paragraph were made before or after the waiver was signed. The Court will assume that these statements were made before the waiver was signed because such an assumption is more favorable to Hinirio.
[10] The form is initialed "JM." (Supp. Hrg., May 31, 2012, at 159:3-5.) Hinirio revealed that his true name was Julian Mercado when the agents were collecting biographical data before Hinirio was read his rights. (*Id.* at 162:24-163:24.)

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 44

present at the interview to translate for the agents. (*Id.* at
150:11-20.) Hinirio was read his rights in both English and
Spanish. (*Id.* at 150:17-152:1.) Agent Garcia also testified that
the agents never mentioned that Hinirio's wife would be arrested
or deported or that Hinirio would spend his life in jail. (*Id.*
at 171:6-24.) Indeed, Agent Garcia testified that he told
Hinirio that he could not give him advice on the number of years
that he was facing. (*Id.* at 153:5-14.)

Agent Garcia further testified that he was present when
Hiniro was arrested, but did not see anyone place a hood over
Hinirio's head. (*Id.* at 162:3-13.) He also testified that he was
not in the car while Hinirio was being transported. (*Id.* at
162:17-20.)

Agent Allen was in the car with Hinirio when he was being
transported. (Supp. Hrg., June 7, 2012, Afternoon, at 14:23-25.)
He characterized Hinirio's arrest and detention as normal. (*Id.*
at 14:18-20.) However, he was not specifically asked whether the
agents had identified themselves or whether a hood had been
placed over Hinirio's head.

"The internal consistency of a witness's testimony, its
consistency with other testimony, its inherent (im)probability,
as well as the witness's tone and demeanor are important factors
in determining credibility, although excessive focus on

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 45

insignificant testimonial inconsistencies to support a finding

of lack of credibility may not be justified." *Chen v. Gonzales*,

434 F.3d 212, 220 (3d Cir. 2005). Here, the Court had an

opportunity to observe the demeanors of Hinirio, Agent Allen,

and Agent Garcia as they testified. Having considered their

demeanors as they testified, the Court finds the testimony of

the agents, specifically Agent Garcia, more credible than

Hinirio's testimony. Having observed Hinirio, the Court finds

Hinirio's testimony to be implausible and not worthy of credit.

As such, the Court finds that Hinirio was read and understood

his rights. Furthermore, the Court finds that the agents did not

threaten Hinirio's wife or threaten Hinirio with a long period

of incarceration if he did not confess.

Having reviewed the totality of the circumstances, the

court holds that Hinirio's waiver of his *Miranda* rights was

knowing, intelligent, and voluntary.

## 2. Voluntariness of Hinirio's Statements

Hiniro also argues that his statements should be suppressed

because: (1) the agents threatened him and his wife; (2) he was

told he would be released if he cooperated; and (3) the

interrogation lasted eight hours.

> A statement may be the product of police
> overreaching even after a defendant has been advised
> of and validly waived his *Miranda* rights. *See*
> *Dickerson,* 530 U.S. at 444 (acknowledging that the

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 46

administration of *Miranda* warnings does not dispense
with the requirement that a statement be made
voluntarily). However, "cases in which a defendant
can make a colorable argument that a self-
incriminating statement was 'compelled' despite the
fact that the law enforcement authorities adhered to
the dictates of Miranda are rare." *Berkemer v.
McCarty,* 468 U.S. 420, 433 n. 20 (1984).

*United States v. Mark*, No. CRIM. 2005-76, 2007 WL 755383, at *16

(D.V.I. Feb. 23, 2007).

The Court has previously noted that it does not credit

Hinirio's statements that he or his wife were threatened by the

agents. In addition, no evidence was offered that Hinirio was

told he would be released if he cooperated. Indeed, Agent Garcia

testified that no promise of any kind was made to Hinirio.

(Supp. Hrg., May 31, 2012, at 183:4-5.) Hinirio was told that

"it was better off for him to be honest at all times" and "[a]t

that time and event he was going to be, probably, seen in a

positive manner . . . ." (*Id.* at 183:5-9.)

Promises by law enforcement that the defendant will
receive leniency in exchange for cooperation may be
so attractive as to be coercive to a defendant.
Nonetheless, "government agents may validly make
some representation to a defendant or may discuss
cooperation without rendering the resulting
confession involuntary." *Miller,* 796 F.2d at 608.

*Mark*, 2007 WL 755383, at *17.

In *United States v. Mark*, this Court held that a "statement

that it would be beneficial to [the defendant] if he cooperated

[does] not constitute psychological coercion" rendering the

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 47

defendant's statements involuntary. *See Mark*, 2007 WL 755383, at *17. Under the circumstances, the Court sees no reason to depart from that holding. As such, the representations by Agent Garcia did not render Hinirio's statements involuntary.

Hinirio also offered no evidence that the interrogation lasted eight hours. Agent Garcia testified that the interview started around "about . . . 9:45, 10:00" in the morning, (Supp. Hrg., May 31, 2012, at 150:21), and concluded around 2:00 or 2:15 in the afternoon, (*Id.* at 156:16-22.) Breaks were taken during the interrogation. (*Id.* at 173:19-21.) Hinirio was provided with water, but not food. (*Id.* at 173:13-25.) He had, however, eaten breakfast before his arrest. (June 7, 2012, Afternoon, at 30:16-20.) There is also no evidence that Hinirio ever requested any food.

In *U. S. ex rel. Coleman v. Mancusi*, the Second Circuit held that a defendant's statements were not involuntary when the defendant was interrogated from 3:30 A.M. to 9:30 A.M. without food or drink. *See U. S. ex rel. Coleman v. Mancusi*, 423 F.2d 985, 986 (2d Cir. 1970). The defendant in that case stuck to his original story until 6:30 A.M. *Id.* During the interrogation, he never requested food or drink. *Id.* He also never requested to end the interrogation. *Id.*

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 48

The factual circumstances presented here are very similar to the circumstances presented in *U. S. ex rel. Coleman v. Mancusi*. Similarly, here, the Court finds that Hinirio's statements were not involuntary.

**3. Invocation of Right to Counsel**

Hinirio also argues that his statements should be suppressed because questioning continued after he invoked his right to counsel.

"[O]nce a defendant in custody invokes the right to remain silent, police officers must 'scrupulously honor []' that request." *United States v. Tyree*, 292 Fed. Appx. 207, 211 (3d Cir. 2008) (citing *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)).

> In the context of an accused invoking the right to counsel, police must stop questioning only where s/he unambiguously invokes that right; "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the totality of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis v. United States*, 512 U.S. 452, 459 . . . (1994). The inquiry is an objective one. *See id*.

*Tyree*, 292 Fed. Appx. at 211.

"If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Davis v. United States*, 512 U.S. 452, 461-622 (1994). "The unambiguous invocation requirement results

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 49

in an objective inquiry that 'avoid[s] difficulties of proof and
... provide[s] guidance to officers' on how to proceed in the
face of ambiguity." *Berghuis v. Thompkins*, 560 U.S. 370, 382
(2010)(quoting *Davis v. United States,* 512 U.S. 452, 458-59
(1994)). "[T]he subjective views of the detective as to what [a
defendant] meant by his statement are not dispositive." *United
States v. Nelson*, 450 F.3d 1201, 1212 (10th Cir. 2006).

A defendant's rights cannot be invoked anticipatorily--
generally, "*both* a custodial setting and official interrogation
is required to trigger the *Miranda* right-to-counsel
prophylactic, absent one or the other, *Miranda* is not
implicated." *Alston v. Redman*, 34 F.3d 1237, 1244 (3d Cir.
1994)(emphasis in original).

In determining whether a defendant is in custody, the Court
considers "the objective circumstances of the interrogation . .
. ." *Stansbury v. California*, 511 U.S. 318, 323 (1994). During
this inquiry, the Court "must examine all of the circumstances
surrounding the interrogation, but the ultimate inquiry is
simply whether there was a formal arrest or restraint on freedom
of movement of the degree associated with a formal arrest." *Id.*
at 322.

Here, it is clear from the circumstances that there was a
formal arrest. As such, Hinirio was in custody.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 50

The Court must now determine whether Hinirio was being interrogated or interrogation was imminent when he initially requested a lawyer. "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Merely giving a suspect *Miranda* warnings does not constitute interrogation. *Cf. United States v. Morgan*, 738 F.3d 1002, 1006 (9th Cir. 2013) ("Here, Morgan was not subjected to the functional equivalent of interrogation . . . [E]ven after Morgan expressly waived her rights, agent Armour waited nearly three hours before interviewing her."); *People of Territory of Guam v. Ichiyasu*, 838 F.2d 353, 358 (9th Cir. 1988)("The reading of *Miranda* warnings most certainly is an action "normally attendant to arrest," not to be considered police coercion.").

Here, Hinirio testified that "[j]ust as we were arriving, and they identified themselves as agents, I asked for an attorney." (Supp. Hrg., June 7, 2012, Afternoon, at 33:17-20.) Specifically, he asked for a lawyer in Spanish. (*Id.* at 33:23-34:2.) He then uttered the word "lawyer" in English. (*Id.*) He said that he made this request more than five or six times. (*Id.*

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 51

34:15-19.) In response, the agents told Hinirio to wait. (*Id.* at
34:20-23). Hinirio also testified that "[w]hen we were already
there, I asked for an attorney." (*Id.* at 54:12-13). Hinirio
testified that he said "I want my attorney." (*Id.* at 54:14-15).

Agent Garcia testified that during Hinirio's interview,
Hinirio "said he might need a lawyer. He thought he might need a
lawyer." (May 31, 2012, at 164:10-14.) Agent Allen testified
that he recalled Hinirio "asking him [during the interview] if
he needed a lawyer."[11] (Supp. Hrg., June 7, 2012, Afternoon, at
15:14-17.)

Hinirio's testimony is very vague. It is not clear exactly
when and under what circumstances he requested a lawyer or made
statements regarding counsel. It appears that he attempted to
invoke his right to counsel as he arrived at the agents' office.
It is also clear from the agents' testimony that he made
statements regarding counsel during his interview.

The burden is on the defendant to establish that he was
subject to custodial interrogation. *See United States v.
Lawrence*, 892 F.2d 80 (6th Cir. 1989); *United States v.
Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989); *United States v.*

---

[11] There is some tension between this statement and Agent Allen's previous
statement under oath that Hinirio requested a lawyer. (*See* Supp. Hrg., June
7, 2012, Afternoon, at 19:9-17.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 52

*Charles*, 738 F.2d 686, 692 (5th Cir. 1984); *United States v. Davis*, No. 1:10-CR-00011, 2010 WL 2405353, at *3 n.5 (D.V.I. June 10, 2010). It follows that the burden was on Hinirio to provide facts permitting the Court to determine whether he was being interrogated or interrogation was imminent when he attempted to invoke his right to counsel. As such, the Court will consider whether he properly invoked his right to counsel as he arrived at the agents' office or during his interview with the agents.

The Court will first consider whether Hinirio invoked his right to counsel when he arrived at the agents' office. No evidence was adduced at the suppression hearing that the agents were questioning Hinirio or otherwise attempting to elicit an incriminating response before his interview. As such, the Court finds that Hinirio was not subject to custodial interrogation when he requested an attorney before his interview commenced.

The next inquiry is whether custodial interrogation was imminent. In *United States v. Kelsey*, 951 F.2d 1196 (10th Cir. 1991), the Tenth Circuit found that a defendant could invoke his right to counsel even though he had not been read his *Miranda* rights and the police had begun to interrogate him. *Id.* at 1198-99. In that case, a police narcotics strike force was searching the defendant's home. *Id.* at 1197-98. The defendant, Joseph B.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 53

Kelsey ("Kelsey"), returned home during the search. *Id.* at 1198.

He was searched, "found in possession of cocaine, arrested and

handcuffed." *Id.* He was then

> brought into the house and told to sit on the couch,
> along with his girlfriend and two other women all of
> whom were also under arrest. The police continued to
> search the house.

> Shortly after he sat down and while he was "still
> trying to get over the initial shock," rec., vol.
> II, at 4, Kelsey asked to see his lawyer three or
> four times. The police responded that if they
> "allow[ed] him to see [his] lawyer now, then they
> would not be able to ask [him] any further questions
> and would have to take [him] to jail." *Id.* Kelsey
> answered that he did not want to go to jail. The
> police also told him that "if [he] was to cooperate
> and talk with the officers, then they'd take it easy
> on [him], or something of that nature." *Id.* at 5.
> The police did not question Kelsey at this point and
> did not read him his *Miranda* warnings until much
> later. Eventually, one of the officers asked Kelsey
> if he wanted to talk to the police. He agreed and
> was questioned in another room. At some point during
> this interrogation, Kelsey was given *Miranda*
> warnings and asked if he wanted to continue the
> conversation. He said he would on the condition that
> the other people in the house were released. Kelsey
> was at his home about an hour to an hour and a half
> before he was taken to jail. During that time he
> made numerous incriminating statements.

*Id.*

The Government asserted that the statements should not be

suppressed because "Kelsey requested counsel before the police

began to question him and before he was read his *Miranda*

rights." *Id.* On appeal, the Tenth Circuit held to the contrary.

*Id.* at 1199. It reasoned that:

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 54

> the fact that Kelsey invoked his right to counsel
> before the police were required to inform him of
> that right is irrelevant. The Supreme Court has
> stated that the rule in *Edwards* is triggered by "some
> statement that can reasonably be construed to be
> expression of a desire for the assistance of an
> attorney *in dealing with custodial interrogation by
> the police*." *McNeil v. Wisconsin,* 501 U.S. 171, 111
> S.Ct. 2204, 2209, 115 L.Ed.2d 158 (1991). It is clear
> from the exchange between Kelsey and the police
> described above that the police intended to question
> Kelsey at some point at his home, and that the police
> understood Kelsey to be invoking his right to
> counsel during questioning. Recognizing the import
> of Kelsey's request, the police stated that if they
> allowed him to see his lawyer they could not question
> him further. We thus conclude that Kelsey's request
> for counsel was sufficient to bring this case within
> the ambit of *Edwards.*

*Id.*

Similarly, in *United States v. Santistevan*, 701 F.3d 1289,

1294 (10th Cir. 2012), the Tenth Circuit found that

interrogation was imminent. *Santistevan*, 701 F.3d at 1294. In

that case, the defendant, Manuel Santistevan ("Santistevan")

turned himself in on charges unrelated to the case. Thereafter,

an FBI agent (the "agent")

> received a phone call from Mr. Santistevan's
> girlfriend, Tiffani Bryan . . . Ms. Bryan told the
> agent that Mr. Santistevan wanted to speak with him,
> and asked if he could meet Mr. Santistevan at the
> jail that night. The agent could hear Ms. Bryan
> speaking to someone else on another phone line, and
> believed that this person was Mr. Santistevan.
> Because it was late at night, he told Ms. Bryan that
> he would visit Mr. Santistevan the next morning.

*Santistevan*, 701 F.3d at 1290 (internal citations omitted).

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 55

When the agent arrived the next morning, Sanistevan handed that agent a letter written by Sanistevan's attorney that stated, in relevant part, that "[a]t this point, Mr. Santistevan does not wish to speak with you without counsel. However, he is not foreclosing that option in the future." *Id.* at 1291. The agent nevertheless initiated a conversation with Sanistevan. The agent asked Sanistevan if he wanted to answer questions about the robberies without a lawyer. Sanistevan answered in the affirmative. The agent then

> brought Mr. Santistevan to the FBI offices.
>
> Upon arrival, the agent placed Mr. Santistevan in an interview room and turned on the video recorder. He first allowed Mr. Santistevan to spend one hour with Ms. Bryan and his mother. Then, before beginning the interview, he had Mr. Santistevan review a *Miranda* rights form. Mr. Santistevan read the form out loud, stated that he understood his rights, and signed the waiver. Over the next three hours, Mr. Santistevan made incriminating statements with respect to two robberies.

*Id.* at 1291 (footnote and internal citations omitted).

Sanistevan argued to the district court that "the agent violated his *Miranda* rights . . . by continuing to question him after he handed the agent" the letter." *Id.* at 1291-92. The district court found that

> Mr. Santistevan unambiguously invoked the right to counsel by handing the letter to the agent. The court also determined that Mr. Santistevan was subject to a custodial interrogation when he invoked the right

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 56

>        to counsel, and that the later waiver of his *Miranda*
>        rights was invalid.

*Id.* at 1292 (internal citations omitted).

On appeal, the Tenth Circuit agreed with the district court that Sanistevan had unambiguously invoked his right to counsel. *Id.* at 1294. It reasoned that "Santistevan, who was also under arrest and in fact held in custody, knew that the agent was there to ask him questions. Therefore, interrogation was imminent . . . [and] Mr. Santistevan could properly invoke his right to counsel . . ." *Id.*

In contrast, in *Pardon v. Secretary, Florida Department of Corrections*, No. 13-14521, 2015 WL 1600067 (11th Cir. Apr. 10, 2015), the Eleventh Circuit held that interrogation was not imminent. *Id.* at *1. There, when the petitioner

>        was first detained, Petitioner asked one of the
>        officers who picked him up if he could talk to an
>        attorney. The officer responded that Petitioner
>        would have to "worry about that later." Petitioner
>        acknowledge[d] that the officer did not interrogate
>        him, and that "there was no questioning going on"
>        when he asked about an attorney.

*Id.* at *1. The Florida state court held that the petitioner could not have invoked his *Miranda* rights because he was not being interrogated and interrogation was not imminent. *See id.* at *4.

The petitioner subsequently filed a 28 U.S.C. § 2254 habeas petition arguing, in relevant part, that his *Miranda* rights had

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 57

been violated. *Id.* at *2. The district court denied the petition. On appeal, the Eleventh Circuit affirmed the district court, holding that "[t]he Florida court's decision was not unreasonable" because "[t]he evidence in this case suggests that although Petitioner was in custody when he inquired about an attorney, he was not undergoing or imminently subject to 'interrogation.'" *Id.* at *4.

Unlike in *United States v. Sandistevan*, there is no evidence that the agents informed Hinirio he was going to be interrogated. Indeed, the circumstances presented here are much more similar to the circumstances presented in *Pardon v. Secretary, Florida Department of Corrections* than the circumstances presented in *United States v. Sanistevan* or *United States v. Kelsey*. Accordingly, any invocation of Hinirio's right to counsel upon his arrival at the agents' office was anticipatory and ineffective.

The Court now turns to Hinirio's statements regarding counsel during the interview. At this point, it is clear that Hinirio was subject to custodial interrogation. As such, the Court must determine whether Hinirio unambiguously invoked his right to counsel through his statements.

As noted above, the testimony diverges on the wording of Hinirio's statements. After hearing the testimony and observing

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 58

the demeanor of the witnesses, the Court credits the testimony

of Agent Garcia--who was translating for Hinirio--that Hinirio

said "he might need a lawyer."

Courts have held that similarly phrased references to

counsel do not constitute the requisite unequivocal invocation

of the right to counsel. *See, e.g. Davis v. United States*, 512

U.S. 452, 462, 114 S. Ct. 2350, 2357, 129 L. Ed. 2d 362

(1994)("Maybe I should talk to a lawyer."); *United States v.*

*Zamora,* 222 F.3d 756, 765-66 (10th Cir.2000)("I might want to

talk to an attorney.") *United States v. Posada-Rios,* 158 F.3d

832, 867 (5th Cir.1998) (I "might want to get a lawyer then,

huh?"); *Diaz v. Senkowski,* 76 F.3d 61, 63-65 (2d Cir.1996) ("I

think I want a lawyer" and "Do you think I need a lawyer?").

Similarly, the Court holds that, here, Hinirio did not

unequivocally invoke his right to counsel. As such, the Court

finds that Hinirio never unequivocally invoked his right to

counsel during a custodial interrogation.

Because Hinirio never unambiguously invoked his right to

counsel during a custodial interrogation, the agents did not

violate Hinirio's right to counsel when they questioned him.

Accordingly, the Court will not suppress Hinirio's statements on

that basis.

*US v. Mejia, et al.*
Criminal No. 2011-35
Memorandum Opinion
Page 59

### IV.   <u>CONCLUSION</u>

For the reasons discussed above, the Court will grant in part and deny in part Hinirio's motions to suppress.


S\_____
                    **Curtis V. Gómez**
                    **District Judge**